# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ALICIA J. ANDERSON, | ) | CASE NO. 5:19-cv-0988 |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| ANNETTE M. POPSON CORRELL, et al., | ) | |
| | ) | |
| Defendants/Counter Claimants. | ) | |

Before the Court is the motion of defendants and counterclaimants Annette M. Correll ("Annette Correll") (originally named as Annette M. Popson Correll) and Dean Correll (together, "the Corrells" or "defendants") for summary judgment as to all claims asserted against them by plaintiff and counterclaim-defendant Alicia J. Anderson ("Anderson" or "plaintiff"), and for partial summary judgment on the issue of liability as to all of their counterclaims. (Doc. No. 19 ["MSJ"].) Anderson filed a response in opposition (Doc. No. 25 ["Opp'n"]) and the Corrells filed a reply (Doc. No. 28 ["Reply"]). For the reasons set forth herein, the motion is granted as to the claims of Anderson and granted in part as to the Corrells' counterclaims.

## I.     PROCEDURAL AND FACTUAL BACKGROUND (as Alleged in the Pleadings)[1]

On April 10, 2019, Anderson filed a complaint in the Portage County Court of Common Pleas, which defendants timely removed on May 2, 2019 on the basis of diversity jurisdiction. In their notice of removal, the Correll specifically represented that the amount in controversy as pled by plaintiff exceeds the $75,000.00 amount in controversy requirement necessary for this Court to

---

[1] This initial factual background is set forth only as context; the facts may be impacted by the later discussion under Fed. R. Civ. P. 36.

exercise diversity jurisdiction.[2] (Doc. No. 1, Notice of Removal ¶¶ 9-10.) Anderson alleges that she is the owner of residential premises at 262 Hawthorne Drive, North Benton, Ohio 44449 (the "property"). (Doc. No. 1-1, Complaint ["Compl."] ¶ 1.) Defendant Annette M. Popson (nka Annette M. Correll) was a tenant under a written lease with Anderson. (*Id.* ¶ 3.) The term of the lease was January 15, 2017 to July 14, 2017, and the monthly rent was $500.00. (*Id.* ¶¶ 5–6.) The gravamen of Anderson's claims is that the Corrells undertook "unauthorized modifications" to the property, which left it "uninhabitable." (*Id.* ¶¶ 9–10.) In her complaint, Anderson asserts claims of voluntary waste, trespass, consequential damages, conspiracy, and punitive damages.

The Corrells answered, largely denying Anderson's allegations, and asserting counterclaims of breach of contract, fraud, tortious interference with business relationship, and intentional infliction of emotional distress. (Doc. No. 3, Answer/Counterclaim ["Countercl."].) The Corrells acknowledge that Annette Correll and Anderson were parties to an agreement dated February 6, 2017. (Countercl. ¶ 5; Doc. No. 19-4, Lease Agreement with Option to Purchase Real Estate ["lease-purchase agreement" ("LPA")].) Defendants allege that, prior to the execution of the lease-purchase agreement, Annette Correll had been renting the property for several months while "performing renovations consistent with a conversation involving [p]laintiff, her daughter,

---

[2] Plaintiff has not challenged the amount in controversy, nor sought remand. Even so, this Court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006). In her complaint, Anderson is seeking $35,150.00 for her voluntary waste claim, unspecified damages for trespass, $11,634.00 in consequential damages, and $2,000,000 in punitive damages. (Doc. No. 1-1, Civil Complaint, Prayers for Relief following ¶¶ 20, 25, 30 and 35.) The Court concludes that the amount in controversy, determined at the time of removal, was sufficiently alleged in the complaint to exceed $75,000. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289–90, 58 S. Ct. 586, 82 L. Ed. 845 (1938) (holding that "the sum claimed by the plaintiff controls" the amount in controversy, and dismissal on amount-in-controversy grounds is only appropriate when it appears "to a legal certainty that the claim is really for less than the jurisdictional amount"); *Rogers v. Wal-Mart Stores, Inc.*, 230 F.3d 868, 871 (6th Cir. 2000) ("[T]he determination of federal jurisdiction in a diversity case is made at the time of removal."); *Prymas v. Kassai*, 858 N.E.2d 1209, 1218 (Ohio Ct. App. 2006) (recognizing that punitive damages are available for trespass claims in Ohio).

Crystal Stillman, and Dean Correll[.]" (Countercl. ¶ 8.) During those months, as well as during the six-month term of the lease-purchase agreement, neither of the Corrells resided at the property, allegedly because it was "uninhabitable" due to several problems itemized in some detail in the counterclaim. (*Id.* (second) ¶ 9.)

As it turned out, Annette Correll was unable to obtain financing to purchase the property after it was discovered through a home inspection that the previous tenant, Anderson's nephew, had been manufacturing methamphetamine on parts of the property (for which he was prosecuted and about which Anderson was knowledgeable despite not revealing it to the Corrells), leaving the property contaminated and requiring remediation. (*Id.* ¶¶ 21–22, 25–26.) Anderson refused to pay for the remediation. As a result, the mortgage company working with Annette Correll would not proceed. Annette Correll was left unable to purchase her "dream home," which allegedly led to significant emotional distress; she also forfeited all the money she had put into the early renovation efforts, which Anderson refused to reimburse despite an alleged contractual obligation to do so. (*Id.* ¶¶ 27–28.)

On July 13, 2019, the Court issued its Case Management Conference ("CMC") Scheduling Order (Doc. No. 10), setting the CMC for September 6, 2019, and requiring Anderson to serve her initial disclosures under Fed. R. Civ. P. 26(a)(1) by August 16, 2019 and the Corrells to serve their initial disclosures by August 23, 2019. As of the filing of the Corrells' dispositive motion,

3

Anderson has not served any initial disclosures.[3] (Doc. No. 19-2, Affidavit of Richard J. Silk, Jr. ["Silk Aff."] ¶ 3.)[4]

On August 23, 2019, defendants served Anderson with their initial disclosures, as well as their First Set of Interrogatories, Requests for Admissions ["RFA"], and Requests for Production of Documents by both email and regular U.S. Mail[5] [collectively, the "discovery requests"]. ("Silk Aff." ¶ 5; *see also* Doc. Nos. 11, 12.) The time for Anderson to respond to the discovery requests has expired and has not been extended; no responses have been filed to any of the discovery. (Silk Aff. ¶ 6.)

## II.    DISCUSSION

### A.    Legal Standard on Summary Judgment, Including Application of Fed. R. Civ. P. 36

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record … ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

---

[3] Under Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e) [requiring disclosures and supplementation], the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Due to her failure to serve any mandatory initial disclosures and/or to show either substantial justification or harmlessness, Anderson is barred from submitting evidence and/or witnesses that should have been disclosed.

[4] Richard J. Silk, Jr. is the defendants' attorney of record. (Silk Aff. ¶ 2.)

[5] Technically, this service of discovery may have been premature since the parties had not yet "conferred as required by Rule 26(f)[.]" Fed. R. Civ. P. 26(d)(1). However, the Court need not be concerned about any issue of timeliness since Anderson has not raised it now and, more notably, did not do so in the Report of Parties' Planning Meeting jointly filed prior to the CMC and after the parties *had* "conferred." (*See* Doc. No. 13.)

Application of this standard is impacted by Fed. R. Civ. P. 36, which "permits one party to request admissions as to a broad range of matters by another party, including ultimate facts and the application of law to fact." *Goodson v. Brennan*, 688 F. App'x 372, 375 (6th Cir. 2017) (citing *United States v. Petroff-Kline*, 557 F.3d 285, 293 (6th Cir. 2009)). "By operation of law '[a] matter *is admitted unless*, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney.'" *Id.* (emphasis in original) (quoting Rule 36(a)(3)). "However, '[a] matter admitted under [Rule 36] is conclusively established unless the court, on motion, permits [the admission to be withdrawn or amended].'" *Id.* at 376 (alterations in original) (quoting Fed. R. Civ. P. 36(b)).[6]

Under the Rule 56 standard, the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment motion. *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (quotation marks omitted) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

Further, "conclusive admissions [under Rule 36], 'cannot be overcome at the summary judgment stage by contradictory affidavit testimony or other evidence in the record.'" *Goodson*,

---

[6] The court of appeals has held that "a formal motion [to withdraw admissions] is not always required[,]" *Petroff-Kline*, 557 F.3d at 293 (citing *Kerry Steel Inc. v. Paragon Indus.*, 106 F.3d 147, 153–54 (6th Cir. 1997)), but that "a withdrawal 'may be imputed from a party's actions,' including the filing of a belated denial[.]" *Id.* (quoting *Chancellor v. City of Detroit*, 454 F. Supp. 2d 645, 666 (E.D. Mich. 2006)). The court in *Petroff-Kline* affirmed the district court's allowance of withdrawal because the government's only "slightly overdue response [*i.e.*, three (3) days late] effectively served as such a withdrawal." *Id.* at 294. In the instant case, Anderson has *never* served responses to defendants' discovery requests, including the RFAs. There is no action of any kind from which this Court might impute withdrawal of the admissions, nor has there been any motion to withdraw, formal or otherwise.

688 F. App'x at 376 (quoting *Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 244 (5th Cir. 2014)). "[B]y never responding to [defendants' RFAs], or filing a motion for relief, [a] [p]laintiff admit[s] and conclusively establishe[s] as fact all statements therein." *Id.* at 375. "Furthermore, 'an admission that is not withdrawn or amended cannot be rebutted by contrary testimony or ignored by a district court.'" *Chao v. Meggitt*, No. 3:04CV7396, 2006 WL 2252526, at *2 (N.D. Ohio Aug. 4, 2006) (quoting *Metzler v. Lykes*, 972 F. Supp. 1438, 1443 (S.D. Fla. 1997) (further citation omitted)).

**B.     Analysis of Claims**

Before addressing each of the claims and counterclaims, the Court first notes that Anderson's opposition brief does not mention the effect under Rule 36 of her failure to respond to any of defendants' discovery requests. Anderson does not contend that she did not receive the discovery requests. Anderson has also made no motion for relief from or withdrawal of these admissions, and she has engaged in no action on this record from which the Court might impute withdrawal.

Therefore, to be clear, the facts contained within the discovery requests, copies of which are found in Doc. No. 19-3 (Exhibit 3), and in particular the facts in defendants' RFAs (Ex. 3 at 257–29[7]), are hereby deemed "conclusively established" under Rule 36 for the purpose of analysis of the claims and counterclaims, notwithstanding any attempt by Anderson in her opposition brief to create material factual disputes by way of arguments and factual assertions unsupported by record references. *See Chao*, *supra*.

**1.     Voluntary Waste**

---

[7] All page number references are to the page identification number generated by the Court's electronic docketing system.

In her claim for voluntary waste, Anderson alleges, *inter alia*, that the Corrells "undertook substantial modification of the [property] without [her] permission[,]" and with "no reasonable justification[,]" which "rendered the premises uninhabitable." (Compl. ¶¶ 8, 10, 12.) She further alleges that defendants' actions "were substantially certain to cause injury to [her] property." (*Id.* ¶ 11.)

"Waste has been defined as an unlawful act or omission of duty on the part of a tenant which results in a permanent injury to the real estate." *Anderson v. Tranquility Cmty. Church*, No. 01CA17, 2002 WL 31521520, at *4 (Ohio Ct. App. Sept. 30, 2002) (quotation marks and citation omitted). "Voluntary waste is willful waste conducted by a tenant[.]" *Id.* "Any injurious alteration of buildings is waste." *Id.* (citing 92 Ohio Jurisprudence 3d (1999) 314, Waste, Section 10). "Likewise, making unauthorized changes in a leased building without justification by the lease is waste." *Id.*

Thus, to establish waste, Anderson must show that the Corrells' actions with respect to the property were unlawful, unauthorized, and injurious to the property. She is unable to do so, given her admissions, pursuant to the operation of Rule 36.

Prior to entering into any agreements, the Corrells toured the property with Anderson and her daughter[8] and identified various issues, including, but not limited to, an intense urine smell, interior destruction, holes in walls, and items not up to code. (RFAs 8, 12.) The Corrells discussed with Anderson the possible renovations they would make and, during the time Annette Correll subsequently rented the property, Anderson was aware that renovations had begun. (RFAs 10, 14;

---

[8] Crystal Stillman is Anderson's daughter. (RFA 5.) She acted on behalf of Anderson with respect to Annette Correll's rental of the property and the negotiation of the lease-purchase agreement. (RFAs 80, 81.) Stillman continued to act on Anderson's behalf after the parties executed the lease-purchase agreement. (RFA 82.)

Doc. No. 19-1, Affidavit of Annette M. Correll ["Correll Aff."] ¶¶ 7–8.) None of the renovations required county permits or professional applications. (Correll Aff. ¶ 5.)[9]

At the time Anderson rented the property to Annette Correll, it was not in a fit and habitable, nor safe or sanitary condition. (RFAs 17–19.)[10] Given the dilapidated, unsanitary, and uninhabitable condition of the property, Anderson is unable to establish the element of injury to property necessary to prove a waste claim. In fact, it was the Corrells who expended $23,551.85 on repairs to the property to restore it to a livable condition, which Anderson has refused to refund. (Correll Aff. ¶¶ 10–11.) "There is simply no evidence that would allow reasonable minds to conclude that the condition of the property . . . has worsened and depreciated[]" due to any actions taken by the Corrells. *Palmer v. Mossbarger*, 27 N.E.3d 944, 950 (Ohio Ct. App. 2015).

The Corrells are entitled to summary judgment on Anderson's claim of voluntary waste.

## 2. Trespass

In her claim for trespass, Anderson alleges that Annette Correll, "while entitled to possession of the premises as a tenant, was not authorized nor entitled to exert full ownership over the premises to the detriment of the reversion or remainder for purposes of substantial structural

---

[9] Anderson's argument in opposition to the motion that the renovations "were, by definition, unauthorized[]" (Opp'n at 397) because the Corrells made no written request, as required by the lease-purchase agreement, is unavailing. Written authorization was required only for "major structural changes" to the property. (LPA at 325, ¶ 5(B).) All the renovations to the property were nonstructural. (Correll Aff. ¶ 4.) Anderson's unsupported assertion to the contrary is not sufficient, under Fed. R. Civ. P. 56, to create a genuine issue of fact.

[10] The following problems were identified: electrical, plumbing, heating and air conditioning, and sanitary appliances not in safe and good working condition; kitchen appliances removed; strong urine smell; other bad odor (later identified as methamphetamine); holes in bedroom walls; broken furniture in house; cracked and broken kitchen cabinets; leaking basement; basement full of trash; stairs without railings; non-code-compliant fuel tank in the basement; debris and trash in the garage; flea infestation; kitchen appliances dirty and full of rotted food; cracked, foul-smelling paneling on the walls; a door leading into the bathroom from the garage; cracked toilet with a broken seat; dirty shower and tub; linoleum flooring in the kitchen with holes and missing portions; broken front screen door; shed full of debris and junk from previous tenants; burned electrical wires in bedroom and kitchen; inoperable furnace and air conditioner; missing window in the garage that had been replaced with an outward-venting fan. (RFAs 20–52.)

modification of the premises." (Compl. ¶ 22.) She alleges that the Corrells "committed unauthorized intentional acts in partially deconstructing . . . [and] rendering [the property] uninhabitable." (*Id.* ¶ 24.) This, Anderson claims, constitutes trespass.

"To state a cause of action in trespass, the property owner must prove two elements: an unauthorized, intentional act by the defendant, and an intrusion by defendant which interferes with the property owner's right of exclusive possession of the property." *McNabb v. Ottawa Cty. Comm'rs*, No. OT-17-036, 2019 WL 1766060, at *5 (Ohio Ct. App. Apr. 19, 2019) (citations omitted).

As already explained, and as admitted by Anderson, the Corrells had permission to enter the property and to conduct renovations. Their actions were not "unauthorized."[11] Further, "[t]respass is an invasion of the possessory interest of property, not an invasion of title." *State v. Herder*, 415 N.E.2d 1000, 1003 (Ohio Ct. App. 1979). Anderson was not in possession of the property at the relevant time when the Corrells were making the renovations. In fact, Annette Correll, by virtue of her rental and lease-purchase agreements had possessory interest. "Under applicable property laws, the owner sacrifices his possessory interests in the property to the renter[.]" *Palmer v. Mossbarger*, No. CVH20130071, 2015 WL 13780836, at *2 (Madison Cty. Ct. Com. Pl. May 27, 2015).[12] As for Dean Correll, he was not a trespasser because, at the very

_____

[11] Anderson makes the same argument regarding authorization as she made with respect to the claim of waste, namely, that there was no written permission sought or given for the renovations. That argument is rejected for the same reasons.

[12] Anderson asserts that the lease-purchase agreement expired on July 14, 2017, at which time possession reverted to her. (Opp'n at 399.) Although Anderson cites no authority for this proposition, it is undoubtedly a correct statement of the law. *See, e.g., Hilty v. Topaz*, No. 04AP-13, 2004 WL 2035324, at *3 (Ohio Ct. App. Aug. 26, 2004) ("A lease agreement transfers both occupation and control of the subject premises [from the owner] to the tenant.") (citation omitted). But Anderson points to nothing in the record to suggest that the Corrells overstayed the lease and continued to make renovations during such overstay. Therefore, Anderson's assertion is irrelevant with respect to the trespass claim.

least, he had Annette Correll's permission to enter the property. Anderson had no authority to "prohibit a tenant from inviting guests" to the property. *Id*.

The Corrells are entitled to summary judgment on Anderson's claim of trespass.

### 3.     Conspiracy

In her conspiracy claim, Anderson alleges that the Corrells "worked in combination to maliciously cause . . . injuries to [her] property in a manner that neither could have accomplished alone." (Compl. ¶ 32.)

"[T]he elements that comprise a claim of civil conspiracy are (1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy." *Mangelluzzi v. Morley*, 40 N.E.3d 588, 601 (Ohio Ct. App. 2015) (citation omitted). "Thus, an action for civil conspiracy cannot be maintained unless an underlying unlawful act is committed." *Id*.

Despite her argument in opposition to the motion that the Corrells "caused substantial damage to [her] house[,]" (Opp'n at 399), this assertion is unsupported by all the admissions in the record. Anderson is simply unable to establish "injury" to her property and/or "an unlawful act[.]" Annette Correll intended to purchase the property and she and Dean Correll were making renovations, with Anderson's knowledge and authorization, in preparation for the purchase and, ultimately, for moving in. They were prohibited from fulfilling that goal by Anderson's own act of failing to disclose the methamphetamine contamination and her subsequent refusal to remediate it, leading to Annette Correll's inability to obtain financing.[13] (RFAs 58–79.)

---

[13] Anderson's admissions include her knowledge that Annette Correll had been pre-approved under the FHA 203(k) Program, which provides a loan for a single mortgage covering both improvements to, and purchase of, property. (RFAs 53–57.)

The Corrells are entitled to summary judgment on Anderson's civil conspiracy claim.

### 4. Consequential and Punitive Damages

Having failed to survive summary judgment on any of her claims, Anderson is not entitled to damages. *Richard v. Hunter*, 85 N.E.2d 109 (Ohio 1949), paragraph one of the syllabus ("Exemplary or punitive damages may not be awarded in the absence of proof of actual damages."); *Graham v. Mansfield Corr. Inst.*, No. 10AP-605, 2011 WL 345633, at *1 (Ohio Ct. App. Feb. 3, 2011) ("claim for consequential damages is not a separate claim but a request for full damages assuming a legitimate claim for relief is otherwise set forth[]").

## C. Analysis of Counterclaims

### 1. Breach of Contract

In their counterclaim for breach of contract, the Corrells allege that Anderson breached both the lease-purchase agreement and the real estate purchase agreement between Annette Correll and Anderson "by, among other things, failing to disclose methamphetamine contamination and/or her actual and/or constructive knowledge of her nephew's methamphetamine manufacturing efforts at [the property] and refusing to remediate the premises as required by the mortgage company." (Countercl. ¶ 33.) The Corrells seek summary judgment on this claim and a hearing as to their damages.

In Ohio, a breach of contract claim has four elements: "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio Ct. App. 1994).

Under the lease-purchase agreement, Anderson acknowledged that Annette Correll had already paid $1,600 in rent from September 10, 2016 through January 10, 2017, and that she further agreed to pay $500 a month from February 10, 2017 through the term of the agreement (ending July 14, 2017), in exchange for "the exclusive right, option and privilege of purchasing [the

property] at any time during the term of [the lease-purchase agreement]." (LPA ¶¶ 2–4.) Under the Real Estate Purchase Agreement, dated June 13, 2017 (*see* Doc. No. 19-6, Exhibit C ["purchase agreement" ("REPA")]), Anderson was required "to pay the cost of any required repairs[.]" (*Id.* at 335, line 17.)

"During the time [Annette Correll] was renting the [p]roperty, [she] fulfilled all of [her] contractual obligations, among other things, timely paying rent, performing the agreed-to renovations, obtaining the [FHA's 203(k)] mortgage program approval, and maintaining the exterior." (Correll Aff. ¶ 9.) Anderson, without any legal excuse, refused to pay the cost of remediation for the methamphetamine contamination as required by the purchase agreement, resulting in Annette Correll's mortgage underwriting company's refusal to go forward with the mortgage process. (RFA 78.) Annette Correll, therefore, "could not complete the mortgage process for purchasing the [p]roperty[,]" (RFA 79), and was deprived of her "exclusive right, option and privilege" to purchase under the lease-purchase agreement. (LPA ¶ 4.)

As a result, the Corrells sustained financial detriment, including, but not limited to, the loss of $23,551.85 expended on renovations to the property, which Anderson has not reimbursed. (Correll Aff. ¶¶ 10–11.)

In opposition, Anderson claims there are material factual disputes as to whether each party fulfilled its contractual obligations. She first argues that, since the lease-purchase agreement expired on July 14, 2017, and the Corrells never tendered the purchase price at any time, there was no binding contract at the time the Corrells attempted to obtain financing for the purchase. (Opp'n at 402.) She further argues that the Corrells had no *written* permission to make any renovations (*Id.* (citing LPA ¶ 5(B))), and that, having failed to exercise the option to purchase, they were to return the property "'in as good order and condition as [it] was on September 10, 2016,'" (*Id.*

13

(quoting LPA ¶ 5(E))), which she claims they failed to do. In addition, Anderson argues that it was not a breach on her part to refuse to pay for remediation because the question of remediation did not arise during the term of the lease-purchase agreement. (*Id.* at 403.) Finally, Anderson asserts that, under ¶ 9 of the lease-purchase agreement, the Corrells are not entitled to reimbursement for any renovations they made while they were in possession of the property if they ultimately decided not to exercise the option to purchase. (*Id.*)

In reply, the Corrells argue that Anderson's arguments "powerlessly contradict [Annette] Correll's conclusively-established testimony" that she complied with all her contractual obligations during the time she was renting the property. (Reply at 443; Correll Aff. ¶ 9.) The Corrells assert that "[p]laintiff's assertions to the contrary do not create issues of material fact." (Reply at 443.)

As for plaintiff's claim that the purchase money was never tendered, the Corrells assert it was not due until closing, which the parties agreed would occur no later than September 8, 2017. (*Id.* (citing LPA ¶ 18; REPA at 337, line 106).) Closing, however, was rendered impossible due to Anderson's refusal to pay to remediate the property, "directly and proximately preventing the Corrells from completing the loan process, closing on the house, and tendering the purchase price." (Reply at 443.)

Finally, defendants argue that Anderson has failed to establish that she did not breach the lease-purchase agreement. The Corrells acknowledge that, under the contract, if they did not exercise their option to purchase, they would "not be entitled to reimbursement for the cost of all or any repairs, maintenance and improvements that have been done to [the property] while [Annette Correll] has paid rent and had keys/access[.]" (LPA ¶ 9.) But if, through no fault of the Corrells, Anderson "fails to convey [the property] . . . , [the Corrells] shall be reimbursed for

14

maintenance and improvements." (*Id.*) There is no time limit in paragraph 9 relating to its enforcement. As argued by the Corrells, and as conclusively established by Anderson's Rule 36 admissions, the property inspection on July 7, 2017 (RFA 69) revealed the need for drug contamination testing (RFA 70), which was performed on September 2, 2017 (RFA 71) and determined that there was methamphetamine contamination (RFA 73). As a result, the mortgage underwriting company suspended Annette Correll's "pending mortgage" (RFA 74) and required remediation by Anderson, not the Corrells. (RFA 76–77). When Anderson refused to pay for the remediation, the mortgage company refused to proceed (RFA 78), resulting in Annette Correll's inability to complete the mortgage process (RFA 79).

The undisputed evidence establishes that the real estate purchase was never completed due to Anderson's refusal to pay for methamphetamine remediation, which was a material breach of the contracts between these parties.

The Corrells are entitled to summary judgment as to liability on their breach of contract counterclaim.

### 2. Fraud

In their counterclaim for fraud—fraud in the inducement, fraud by omission, and constructive fraud—the Corrells generally allege that Anderson had a duty to disclose (and not conceal) facts that were material to the transactions between these parties, but failed to do so, with the intent of misleading the Corrells into justifiably relying upon the misrepresentations. (Countercl. ¶ 37.)

A claim for fraud requires proof of the following elements: "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to

15

whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *State ex rel. The Illuminating Co. v. Cuyahoga Cty. Court of Common Pleas*, 776 N.E.2d 92, 97–98 (Ohio 2002) (citations omitted). "In the context of a claim for fraud, a misrepresentation of fact is material when, under the circumstances, it would likely affect the conduct of a reasonable person in deciding whether to enter into the transaction at issue." *Oryann, Ltd. v. SL & MB, LLC*, No. 2014-L-119, 2015 WL 9485646, at *8 (Ohio Ct. App. Dec. 28, 2015) (citation omitted).

Defendants argue that Anderson made several false representations or concealments. First, she "fail[ed] to orally disclose the methamphetamine contamination despite her knowledge of the same and duty to disclose, and later, by representing on the Residential Property Disclosure Form that there were no hazardous materials or material defects present." (MSJ at 230; Correll Aff. ¶ 13; RFAs 59–68; Countercl. ¶ 19; Doc. No. 9, Answer to Counterclaim ["Answer"] ¶ 17.) The presence of methamphetamine was material because, if the Corrells had known of its presence on the property, they "would have never rented it, made the renovations, taken steps to purchase it, or exposed [themselves] to hazardous chemicals and potentially adverse health effects." (Correll Aff. ¶ 15.) The Corrells argue that Anderson "intended the Corrells to rely upon their mistaken belief, and the Corrells did in fact rely upon it by carrying on with the renovations and the pre-approval process, and as a result, incurred financial detriment." (MSJ at 230–31 (citing Correll Aff. ¶¶ 10–12, 14, 19).)

In opposition, Anderson argues that she "had not occupied the residence since May 2014[,]" (Opp'n at 404 (citing Doc. No. 19-6, Residential Property Disclosure Form ["disclosure form"] at 344)), seemingly suggesting that she could not have known about any contamination.

She also claims that she repeatedly indicated, and the Corrells agreed, that the transfer was "as is." (*Id.*) Anderson argues: "Not only have [d]efendants failed to show that [p]laintiff had actual knowledge of the contamination, the amount of contamination eventually ascertained was below the levels set by the U.S. EPA." (*Id.* at 404–05.) Anderson claims that, as a result, the Corrells cannot establish the element of a misrepresentation or concealment. Anderson further asserts that the Corrells have failed to show that any misrepresentation or concealment of the methamphetamine contamination was material. (*Id.* at 406.) And lastly, Anderson argues that "any injury [that] occurred to [d]efendants, . . . was from their own failure to obtain financing." (*Id.* at 407.)

Unfortunately, Anderson cannot overcome the effect of her Rule 36 admissions (cited in the Corrells' motion) with respect to her knowledge, and lack of disclosure, of the contamination; further, she makes no attempt to do so. Her argument regarding the levels of contamination is irrelevant. Anderson's admissions conclusively establish that she knew her nephew, the previous tenant, was manufacturing methamphetamine on the premises and, at the very least, she failed to disclose that fact and, at the worst, she affirmatively concealed it.[14]

Anderson had a statutory duty under Ohio Rev. Code § 5302.30 to disclose the methamphetamine contamination on a residential property disclosure form. By her own admission, at the time the parties entered into the lease-purchase agreement, Anderson failed to provide any such form (RFA 91) and, despite her admissions regarding her knowledge of her nephew's

---

[14] As noted by the Corrells in their reply brief: "Irrespective of the contamination level, the underwriter, not the Corrells, demanded that [p]laintiff pay for remediation before the mortgage process could proceed to its conclusion. But for [p]laintiff's refusal to comply, [p]laintiff would not now be before the Court arguing about whether the mortgage underwriter correctly interpreted the meth contamination levels in the report." (Reply at 446.)

activities on the property, she never made a disclosure regarding even the *possibility* of the presence of a hazardous material.

Anderson's reliance on the "as is" language in the parties' agreements is misplaced. The specific "as is" provision confirms that Anderson made no representations or warranties "except as set forth in the Residential Property Disclosure Form[.]" (REPA at 335, lines 35–37.) The disclosure form itself represents that Anderson does not "know of the previous or current presence of" hazardous substances. (Disclosure Form at 345 ¶ H.) The Corrells were entitled to, and did, rely upon this representation. (Correll Aff. ¶ 14.)

Anderson's argument that the Corrells essentially caused their own injury, if any, ignores the evidence that Annette Correll had timely obtained pre-approval of the necessary loan, but was unable to complete the process due to Anderson's refusal to pay for the methamphetamine remediation. As a result, the Corrells not only lost the opportunity to purchase what Annette Correll considered her "dream home," they lost the money they had already spent on renovations to the property and on the loan process. (Correll Aff. ¶¶ 9–10, 12; RFAs 53–57, 73–79.)

The Corrells are entitled to summary judgment as to liability on their counterclaim for fraud.

### 3.    Tortious Interference with Business Relationship

In their counterclaim for tortious interference, the Corrells allege that they "held a contractual relationships [sic] with [p]laintiff and the mortgage company for purposes of purchasing [the property] through a 203k [sic] construction loan guaranteed by the FHA, about which [p]laintiff was actually aware, which [p]laintiff intentionally and improperly, without the privilege to do so, precluded Annette Correll from consummating, resulting in termination of the

Lease Purchase Agreement and Real Estate Purchase Agreement, and the mortgage company's withdrawal from the mortgage process." (Countercl. ¶ 42.)

Tortious interference with a business relationship or a prospective business relationship generally occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995). "[T]o recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Kenty v. Transam. Premium Ins. Co.*, 650 N.E.2d 863, 866 (Ohio 1995).

The Corrells argue they had a business relationship with the bank through which they obtained pre-approval for the FHA's 203(k) Program and Anderson was aware of the relationship, as evidenced by her signing of the real estate purchase agreement, which specifically states that the Corrells would be seeking financing through the FHA's 203(k) Program. (RFAs 53–56; REPA at 335, line 11.) Although Anderson was contractually required to pay for the necessary methamphetamine remediation, she refused to do so, with full knowledge that this would result in the Corrells' loss of the mortgage. (RFAs 57, 74–77.) When the mortgage company refused to go forward with the mortgage contract, the Corrells lost the opportunity to purchase their "dream home" and forfeited the costs of the renovations already completed; in addition, Annette Correll's credit rating was negatively impacted. (RFAs 78–79; Correll Aff. ¶¶ 10–12.)

In opposition, Anderson argues that, by the Corrells' own admission, no mortgage contract was ever executed. (Opp'n at 407–08.) She claims that, while she was aware that the Corrells were

working with banks to try to obtain financing, she "could not have knowledge of a contract that did not exist." (*Id.* at 408.) Anderson asserts that defendants have failed to establish that the burden of paying for the remediation was on Anderson (and therefore that her refusal to pay was unjustified) and, although the real estate purchase agreement states that the seller will pay the costs of repairs, that provision is too vague to show a meeting of the minds.

In reply, defendants point out that there need only be a business relationship, as opposed to a formal contract, to establish the first element of a tortious interference claim. Anderson's knowledge of the Corrells' relationship with the bank and the mortgage company was evident from the language of the agreement the parties signed under which Anderson committed to paying the expenses incurred by the Corrells, including the expense of "underwriting[.]" (REPA at 335, lines 18–20.) As to elements three, four and five, the Corrells insist that they are conclusively established by way of Anderson's various admissions. (Reply at 448–49.)

It is uncontroverted that, due to Anderson's failure to disclose the possible methamphetamine contamination and, after its discovery through inspection, her refusal to pay the cost of remediation, the Corrells were unable to obtain the loan to purchase and repair the property, resulting in the failure of the real estate purchase agreement, the Corrells' loss of expenditures on renovations and mortgage-related fees, and damage to Annette Correll's credit rating. That said, those facts do not establish that Anderson, by allegedly breaching her contract(s) with the Corrells, intended to interfere with the Corrells' alleged contract with the bank and/or mortgage company.

"The intent element of tortious interference with a contract . . . requires a showing that the one who interfered intentionally *procured* the contract's breach." *Gosden v. Louis*, 687 N.E.2d 481, 500 (Ohio Ct. App. 1996) (emphasis added) (citing *Kenty*, 650 N.E.2d at 866–67). The mere fact that Anderson's actions may have had the effect of causing a business relationship and/or a

potential contract between the Corrells and their bank or their mortgage company to fail is not the equivalent of procurement. "The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other." *Id.* (quoting Restatement (Second) of Torts, § 766 (1979), Comment *h*).

The Corrells are not entitled to summary judgment on their counterclaim for tortious interference with a business relationship.

### 4. Intentional Infliction of Emotional Distress

In their counterclaim for intentional infliction of emotional distress, the Corrells allege that Anderson "intended to cause Annette Correll severe emotional distress, or knew or should have known that her actions would result in serious emotional distress to Annette Correll." (Countercl. ¶ 46.) They allege that Anderson's conduct "was so extreme and outrageous as to go beyond all possible bounds of decency, such that her actions could be considered as utterly intolerable in a civilized society, and was made by [p]laintiff with actual malice, ill will, recklessness, willful and wanton conduct, and/or a total disregard for the rights of Annette Correll." (*Id.* ¶ 47.)

In Ohio, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007).

The Corrells argue that they repeatedly expressed to Anderson how much the property meant to Annette Correll. (MSJ at 232.) They claim: "Anderson knew or at the very least should have known that Mrs. Correll would be devastated if she was unable to buy the [p]roperty, yet

Anderson concealed the methamphetamine contamination and then refused to remedy the problem." (*Id.*) They conclude that "Anderson's actions in deliberately hiding the fact that her nephew, the previous tenant, was charged and convicted of manufacturing methamphetamine at the [p]roperty, tricking the Corrells into signing the Lease-Purchase Agreement and making renovations, and then refusing to do what was necessary for them to purchase the [p]roperty as promised is extreme and outrageous conduct." (*Id.* at 232–33.)

The Corrells claim that Annette Correll has been diagnosed with depression and prescribed medication, and has been undergoing counseling since September 2019. (Correll Aff. ¶¶ 22–23.) "After losing [her] dream home, [Annette Correll] decided that [she] no longer wanted to live in Ohio[,]" and moved to Pennsylvania. (*Id.* ¶ 21.)

In opposition, Anderson argues that the Corrells "assume far too much." (Opp'n at 410.) She claims that asserting that Annette Correll repeatedly told Anderson how much she wanted to purchase the property does not establish any intent on Anderson's part to cause harm. (*Id.*) Plaintiff further argues that there is no evidence that she "tricked" the Corrells into anything, that there is no behavior that shocks the conscience, and that there is no evidence, other than Annette Correll's "bald, self-serving statement[s]" that she has suffered and continues to suffer psychological trauma. (*Id.* at 411–12.)

In reply, the Corrells argue that they have established the elements of this claim and Anderson has "failed to come forth with any evidence to the contrary." (Reply at 450.)

On this counterclaim, Anderson has the better view. Notwithstanding Annette Correll's affidavit claiming that she has suffered psychological trauma for which she receives counseling and takes medicine, there is no other record evidence to support those assertions. Notably, the

Corrells cite to no relevant admissions by Anderson nor to any expert testimony.[15] Even taking the Corrells' assertions as true, causation is not obvious and/or evident.

The standard for this tort adopted by Ohio finds its source in the Restatement (Second) of Torts § 46(1) (1965). *See Yeager*, 453 N.E.2d at 671. Comment *d* to Section 46 sheds light on the severity that must be proven to prevail on this claim:

> *d. Extreme and outrageous conduct.* The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

There is nothing inherently extreme and outrageous about the conduct in this case. It is merely a deal gone bad (perhaps even *very* bad) and, although there is liability on certain legal theories, intentional infliction of emotional distress is not one of them.

Defendants are not entitled to summary judgment on this counterclaim.

## III.    CONCLUSION

For the reasons set forth herein, defendants' motion for summary judgment (Doc. No. 19) is **granted** as to Anderson's claims for voluntary waste, trespass, and conspiracy (and the related damages claims), and all of plaintiff's claims are dismissed.

---

[15] In their reply, in support of their assertion that Annette Correll "suffered depression, anxiety, and severe psychological distress that requires psychiatric medication and counseling[,]" (Reply at 450), the Corrells cite RFAs 10–20, 58–80. But these RFAs do not support this assertion in any way.

Further, defendants' motion for summary judgment is **granted** as to their counterclaims for breach of contract and fraud,[16] but **denied** as to the counterclaims for tortious interference with business relationship and intentional infliction of emotional distress. Defendants are free to consider whether they wish to proceed with the latter two claims or voluntarily dismiss either or both of them.

By March 27, 2020, counsel shall confer and jointly file a statement suggesting a method to proceed toward final resolution of this case.

**IT IS SO ORDERED**.

Dated: March 18, 2020

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[16] Because the "common-law duty not to deceive a party into entering the contract or agreement is . . . independent and separate from a duty not to breach a contractual obligation . . . [p]laintiff can [ordinarily] maintain a fraud claim based on a theory of fraud in the inducement or promissory fraud alongside his breach of contract claim." *King v. Hertz Corp.*, No. 1:09-CV-2674, 2011 WL 1297266, at *3 (N.D. Ohio Mar. 31, 2011). That said, at this juncture, it is not clear that defendants can proceed with both claims (given the economic loss theory that a party cannot recover in tort for purely economic damages) and/or obtain separate damages (to the extent there may be overlap between the two claims). The Court will likely require briefing on this issue.